1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| 10 MARIO MORALES, | Case No. CV 15-04069-DOC (KK) |
| 11 Petitioner, | |
| 12 v. | FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| 13 JEFFREY BEARD, Warden, | |
| 14 Respondent. | |
| 15 | |

16

17    This Final Report and Recommendation is submitted to the Honorable

18 David O. Carter, United States District Judge, pursuant to Title 28 of the United

19 States Code, section 636 and General Order 05-07 of the United States District

20 Court for the Central District of California.

21                                      **I.**

22                **SUMMARY OF RECOMMENDATION**

23    Mario Morales ("Petitioner"), a California state prisoner proceeding pro se,

24 has filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to Title 28 of

25 the United States Code, section 2254(d), challenging his 2013 convictions for

26 robbery and vandalism in Los Angeles County Superior Court.  On habeas review,

27 Petitioner sets forth claims of sentencing error, insufficient evidence, denial of his

28

right to counsel of his choice, and juror misconduct.  Because Petitioner's claims fail on their merits, the Court recommends the Petition be denied.

## II.
## CLAIMS FOR RELIEF

Petitioner's claims, as presented in his Petition, are as follows:

(1) <u>Claim One</u>: The use of Petitioner's prior juvenile adjudication to enhance his sentence violated his rights under <u>Boykin v. Alabama</u>, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969) and <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000);

(2) <u>Claim Two</u>: The evidence was insufficient to support Petitioner's convictions for two counts of vandalism and one count of robbery;

(3) <u>Claim Three</u>: The trial court violated Petitioner's right to counsel of choice by denying his request to replace his appointed counsel with retained counsel; and

(4) <u>Claim Four</u>: Juror Six engaged in misconduct and should have been excused by the trial court.

Pet. at 7-19.

## III.
## PROCEDURAL HISTORY

### A.   STATE COURT PROCEEDINGS

On June 8, 2012, following a jury trial in California Superior Court for the County of Los Angeles, Petitioner was convicted of four counts of second degree robbery (counts one through four), one count of vandalism (count five), one count of vandalism of religious property (count six), and one count of possession of a controlled substance (count seven). Lodg. 1 at 392-98, 409-14, 509-11.[1]  The Court

---

[1] The Court's citations to Lodgments refer to the documents lodged by Respondent in support of the Answer. ECF Docket Nos. ("dkt.") 28-33. Lodgment No. 1 is a copy of the Clerk's Transcript ("CT") from Petitioner's proceedings in the California Superior Court.  Although the second volume of the Clerk's Transcript is identified on the docket as Lodgment No. 2, this appears to

2

further found the following enhancements: (a) Petitioner had used a gun during the commission of counts one through four and six, and, thus, added ten years pursuant to California Penal Code section 12022.53(b); (b) Petitioner had been convicted of a prior strike offense based on a juvenile adjudication, and, thus, the sentence imposed on counts one through four was doubled pursuant to California Penal Code sections 1170.12(a)-(d) and 667(b)-(i); and (c) Petitioner had a prior prison term based on his 2004 conviction for assault, and, thus, imposed an additional year pursuant to California Penal Code section 667.5(b).  CT 501-06, 509-11.  Accordingly, on March 5, 2013, the trial court sentenced Petitioner to eighteen years in state prison.  Id.

Petitioner appealed the judgment to the California Court of Appeal.  Lodg. 2. On August 20, 2014, the California Court of Appeal affirmed in part and reversed in part Petitioner's conviction on direct appeal in a reasoned decision.  Lodg. 5. The court found (1) the conviction for vandalism of religious property in count six should be modified to misdemeanor vandalism; (2) the firearm enhancement on count six was improper; and (3) the prior prison term enhancement based on Petitioner's 2004 conviction for assault was improper.  Id.  The judgment was affirmed in all other respects.  Id.

On September 29, 2014, Petitioner filed a Petition for Review in the California Supreme Court.  Lodg. 6.  On November 12, 2014, the California Supreme Court summarily denied review of the appeal.  Lodg. 7.

On April 14, 2015, Petitioner constructively filed[2] a petition for writ of habeas corpus in the California Supreme Court.  Lodg. 8.  On July 8, 2015, the California Supreme Court summarily denied the petition.  Lodg. 9.

---

be in error because Lodgment No. 2 also has been assigned to the lodged copy of Petitioner's Opening Brief on appeal to the state court.  See Dkt. 30.  Lodgment No. 12 is a copy of the Reporter's Transcript ("RT") of Petitioner's trial court proceedings.

[2] Under the "mailbox rule," when a pro se prisoner gives prison authorities a pleading to mail to court, the court deems the pleading constructively "filed" on

On July 29, 2015 and November 3, 2015, pursuant to the mandate of the California Court of Appeal, the Los Angeles County Superior Court amended the judgment to (1) reduce Petitioner's conviction on count six to misdemeanor vandalism; (2) strike the firearm enhancement on count six; (3) reduce Petitioner's sentence on count six by one year to run concurrently with the sentence imposed on count one; and (4) strike the prior prison term enhancement.  Lodgs. 10, 11.  Accordingly, the court reduced Petitioner's sentence to seventeen years.  Id.

**B.    FEDERAL COURT PROCEEDINGS**

On May 20, 2015, Petitioner constructively filed the instant Petition.  Dkt. 1 at 3, 22.  On January 21, 2016, Respondent filed an Answer contending Petitioner's claims are meritless.  Dkt. 27.  Petitioner did not file a Traverse.  The matter thus stands submitted and ready for decision.

**IV.**

**RELEVANT FACTS**

For a summary of the facts, this Court relies on the California Court of Appeal's reasoned decision on Petitioner's direct appeal:[3]

**Prosecution Evidence**

> At approximately 7:40 p.m. on January 3, 2011, Benjamin S. and his friends Josue, Christopher, and Roberto, all minors, were walking down Westmoreland Avenue, near James M. Wood Boulevard.  A car pulled up and cut them off.  Benjamin was scared because they were in a bad neighborhood.  Morales was in the driver's seat of the car and

---

the date it is signed.  Roberts v. Marshall, 627 F.3d 768, 770 n.1 (9th Cir. 2010) (citation omitted).  This Court presumes Petitioner gave his petition to prison authorities on the date it was signed.

[3] Because this factual summary is drawn from the California Court of Appeal's opinion, "it is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence."  Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2008) (citations omitted).  To the extent Petitioner challenges the accuracy of this summary, the Court has independently reviewed the trial record and finds the summary accurate.

1    Alvarado was in the passenger seat. Morales asked, "Where are you
2    from?" Benjamin knew this meant Morales wanted to know if he was
3    from a gang, and Benjamin responded that he did not "gangbang or
4    that I'm not from nowhere." The two men seemed mad at something.
5    Benjamin had seen Morales before, just walking around the street, and
6    he remembered his tattoos. Alvarado pulled out a gun and held it
7    outside the car window, pointed down. Morales got out of the driver's
8    seat and approached Benjamin's group looking "madder and
9    madder." Alvarado moved into the driver's seat of the car. Morales
10   said something like, "What do you guys got on you?" Benjamin saw
11   his "friends . . . taking out their stuff." He did not want to surrender
12   his property, but he was afraid, so he gave up his iPod and some
13   earphones. His friends all gave up iPods. Josue at first tried to slip
14   away but Morales saw him. Josue gave Morales "his stuff." Benjamin
15   heard someone say, "Let's go, Peanut." After Morales took their
16   belongings, he got in the passenger seat of the car. Benjamin did not
17   want to call the police and get himself in deeper trouble. He and his
18   friends began walking toward the bus stop. A short time later, they
19   saw a helicopter and heard sirens.
20           Approximately 20 minutes after the robberies of the four
21   youths, at approximately 8:00 p.m., Officer Nam Phan of the Los
22   Angeles Police Department (LAPD) and his partner noticed two males
23   standing in front of the Yangmani restaurant, located at the
24   intersection of Olympic Boulevard and Magnolia Avenue. One of the
25   males was spray painting graffiti on the wall of the restaurant, while
26   the other stood on the sidewalk. The male on the sidewalk was
27   looking from side to side and appeared to be acting as a lookout. He
28   was tall, "bulkier" than the male who was spray painting, and wearing

dark clothing.  Alvarado was nearby - sitting in the driver's seat of a blue or teal Toyota Camry.  The Camry's front passenger door was open.  The two males standing in front of the restaurant ran when the officers approached.  The male acting as the lookout ran south.  The male who had been spray painting ran toward the Camry, then dropped the spray paint can and ran north.

Officer Phan saw spray-painted graffiti on a building across the street from the restaurant.  It was of the same color.  The graffiti on both buildings read, "M.S." and "13."  The paint on the building across the street from the restaurant was still somewhat wet.

Officer Denward Chin arrived at the scene to assist Officer Phan, who had detained Alvarado.  While speaking with Alvarado, Officer Phan saw the "bulkier"-sized male return.  Officer Phan identified him as Morales.  He was aggressive and combative with the officers.  Morales yelled that the Camry belonged to him and he was going to take it.  He approached the officers and continued yelling even though he was close to them.  Officer Phan asked Morales to step back while they investigated.  Morales became more aggressive.  He clenched his fists and took a fighting stance.  Officer Chin spoke to him and Morales began to calm down.  Morales then refused to put his hands on his head and tried to take a swing at Officer Chin.  Officer Phan and another officer took Morales to the ground and then into custody.  Morales continued to challenge Officer Phan to a fight while he was in the back of Officer Chin's patrol unit.

When Benjamin heard the helicopter and police sirens, he and his friends approached the police activity.  Benjamin saw that the police had detained the car the defendants were in when they took his property.  Benjamin approached and asked the officers if they would

1  check the car for his property.  Benjamin identified his iPod.  Benjamin
2  also identified the defendants.
3       Josue approached the officers with Benjamin and appeared
4  frightened.  Josue was afraid to tell them how he knew the detained
5  individuals.  He said, "I'm scared.  I just want my stuff back."  Josue
6  then pointed to the car and said it was the car used to stop him when
7  his iPod was taken.  Josue said the people the police had detained were
8  the same people in the vehicle when his property was taken.  Josue
9  made a field identification from the back seat of a police car, and he
10  identified Alvarado and Morales.  Josue said Alvarado pointed a gun
11  toward Josue's feet and demanded property.  Josue also said that he
12  recognized both defendants from the area.  Josue told Officer Phan
13  that he initially lied to the defendants and said he did not have
14  anything on him, but he was afraid he would be shot or killed so he
15  gave up his property.
16       Officer Phan found Benjamin's iPod when he searched
17  Alvarado.  He found an iPod identified as Roberto's in the center
18  console of the Camry.  When Officer Chin removed Morales from his
19  patrol car, he saw two iPods on the floorboard where Morales had
20  been sitting.  The iPods belonged to Christopher and Josue.  At the
21  police station, officers found a baggie in Morales's shoe.  It held 1.91
22  grams of an off-white powdery substance containing cocaine.
23       Benjamin was familiar with his friends' iPods and identified the
24  iPods shown in People's exhibit 4 at trial.  He matched each iPod with
25  its owner.  He recognized each iPod because he often used them.
26  Benjamin did not see Roberto hand over his iPod to Morales.
27       Nicolas Hernandez, the pastor of the church located across the
28  street from the Yangmani restaurant on Olympic Boulevard, first saw

1   the graffiti identified in People's exhibit 6 on the wall of his church in

2   January 2011.  He had not given anyone permission to place the

3   markings on the wall.

4   Officer Richard Rico is an inmate telephone coordinator for the

5   LAPD, and he retrieved recordings of telephone calls from January 3,

6   4, and 5, 2011, for jail cell B3.  Only Alvarado and Morales were

7   housed in cell B3.  The audio recording of the calls was played for the

8   jury, and Detective Matthew Gares, the investigating officer in the

9   case, identified Morales's voice in all three calls.  During the first call,

10  Morales told a woman that he had been arrested for robbery.  He said

11  he was with "Discipulo."  He said he started to fight with the cops

12  and an eight-ball of cocaine was found in his shoe.  He said, "But I

13  should be all-right [*sic*] because, I mean, somebody over there might

14  know these kids.  I'm gonna send somebody who will talk to 'em."

15  Morales also said it was not "that big of a deal," but he was worried

16  that "these fools" would go to court and "they gonna start adding way

17  more charges."  He said, "I'll be all-right baby.  I mean ... this shit

18  ain't nothing."  He added, "If anything, I'm gonna get these fools'

19  addresses and names and everything.  When I see my lawyer I'll get all

20  the information."

21  In a second call, Morales spoke with a different woman and told

22  her that he left "the 380" with "Minor."  In the third call, Morales

23  told a woman, "I'm gonna try to find out who these fools are

24  homegirl.  And ... I'm gonna give you their hook-ups."  He said he

25  wanted to "get at these fools or something, ... or tell 'em we'll, you

26  know, give them 500 bolas of fuckin' ... or whatever...."

27  After the January 3, 2011 incidents, Morales was released on

28  bail.  He approached Benjamin on the street two or three times.

Morales promised Benjamin money and other things for Benjamin to
lie in court and say he was using drugs the day of the robberies.  On
another occasion, Morales asked Benjamin to talk to his former lawyer
and to lie about everything.  Morales wanted Benjamin to say that they
were drinking together and doing drugs together that day "so ... he
could get out of court."  Benjamin did what Morales asked and went
to see Morales's attorney.  He lied to the attorney, who kept asking
him if it was true.  Josue went with him.  Benjamin was promised
money, drugs, guns, and a trip to Las Vegas.  Benjamin accepted some
crystal meth from Morales.  He felt he had to take something for the
deal to be legitimate.  Benjamin did not tell the detective about his
interactions with Morales because he thought the promises would be
kept and he was scared.  He knew Morales was an active gang member
and Benjamin was always in Morales's neighborhood.  He believed
that if he lied he would be safe in his neighborhood again.  Benjamin
said that certain people whom Morales knew would "mad dog" him,
or stare him down, on the streets.  When Benjamin got to court, he
changed his mind and did not want to contradict himself and look like
a fake.

At trial, Josue testified that he was so drunk on the night of
January 3, 2011, that he could not recall "that certain event."  He did
not remember why he spoke with police officers.  When asked if he
saw anybody in court whom he saw on January 3, 2011, he answered,
"Nope."  He was not concerned about testifying.  He did not think
anything was taken from him on January 3, 2011, but he thought he got
his iPod back at the police station.  Josue remembered meeting with
the prosecutor and Detective Gares in March 2011 and admitted
saying he did not want to talk to the two defense attorneys because he

9

was scared.  Josue testified on March 10, 2011, but he did not really remember testifying under oath.  He did not recall telling the prosecutor and Detective Gares that he was scared and did not want to have to face the defendants.  He did not recall any of his testimony at the preliminary hearing.  He denied that Morales had contacted him and told him to contact Morales's attorney.  He did not remember Morales assuring him he would be safe if he said he did not recall the incident and stated, "I honestly don't remember nothing."

Josue also did not recall repeatedly calling the prosecutor's office in April 2011, expressing concern because he heard that Morales had been released back into the community.  He said that he and his companions "came up with a fictional story" to get their stuff back when they spoke with police officers on the night of January 3, 2011.

A deputy district attorney who shared an office with the prosecutor in April 2011 testified that she answered the prosecutor's telephone on one occasion because it kept ringing "over and over."  A caller with a young male voice indicated he was being threatened.  He sounded nervous and fearful.

Detective Gares met with Josue and Benjamin on January 4, 2011, at the Olympic police station.  Josue went to the station voluntarily.  He appeared to be nervous.  He trembled as he spoke and said he was in fear.  Josue told Detective Gares that the defendants pulled up in their car and blocked the path of Josue and his three friends on January 3.  Morales was driving, and Alvarado was the passenger.  Alvarado asked, "Where are you from?"  Josue answered that they were not from anywhere.  Josue said that Alvarado then brought up a firearm to eye level, and Josue and his friends were in fear.  Morales got out of the car and took Josue's and his friends'

10

1    iPods and other property.  Alvarado got into the driver's seat, yelled
2    for Morales to get in, and they drove away with the property.
3        On January 20, 2011, Detective Gares drove Josue and
4    Benjamin to court because they were not old enough to drive.  They
5    were very cooperative but were concerned about testifying.  They
6    asked if they could wear disguises in court.  On the day of the
7    preliminary hearing, March 10, 2011, the two youths were still
8    cooperative but very scared.  The two previous defense attorneys and
9    a defense investigator wanted to meet with them before they testified.
10   Both boys refused to speak with them.  One of the attorneys asked
11   where they lived and Detective Gares told the boys not to provide
12   their addresses.  They both testified at the preliminary hearing.
13   Afterwards, Josue was upset, shaking, and very scared.  He believed he
14   had been recognized in court.  The prosecutor provided Josue with a
15   business card stating the direct telephone line to her office and told
16   him to call if anything happened.  Detective Gares gave Josue his card
17   and cell phone number in the event anything happened.  In the first
18   week of April 2011, the prosecutor called the detective and told him to
19   call Josue right away because he was very scared.
20       When Detective Gares called Josue, Josue was extremely upset.
21   He said Morales had been released.  He was worried about his safety.
22   Josue knew Morales was an MS gang member, "one of the main guys
23   in that area."  Detective Gares told Josue to dial 911 if anything came
24   up and to call the detective if it was not an emergency.
25       When Detective Gares contacted Josue at a later date about his
26   next court appearance, Josue's attitude had completely changed.  He
27   said, "I don't want to talk about the case.  I don't want anything to do
28   with the case.  I don't want to go to court.  I just want it all to go away,

11

please leave me alone." Detective Gares asked repeatedly if anything had happened, but Josue just said "No" and that he did not want to talk about it.

On April 30, 2012, when Detective Gares went to pick up Josue and Benjamin for court, Josue refused to go with them. He said he would "take himself to court," but he did not appear. Benjamin rode with Detective Gares to court and said he believed he was in danger. He at first appeared to be fine, but he then saw some individuals in the hallway and began shaking. He said he had to get out of there. Detective Gares took Benjamin to another hallway. Benjamin began to cry and said he was scared. He said that individuals from the neighborhood who were associated with Morales had "mad-dogged" him on the street.

During a recess in the midst of Benjamin's trial testimony, he told Detective Gares that Morales had approached him after being released from custody. Morales took Benjamin and Josue to his attorney and told them to make up a story or say they did not remember what happened. Morales promised them money, trips, drugs, and guns. The detective immediately notified the prosecutor. It was the first time that the detective and prosecutor had learned of this. Benjamin told them he felt he had to accept the deal from Morales in order to ensure his safety. He was concerned with being labeled a snitch and getting beaten up. Benjamin told them that he thought about it and decided he did not want to sit on the witness stand and lie and look like a fool.

. . .

**Defense Evidence**

. . .

12

1         Leonard Rivas was a community intervention worker with

2    Aztec Rising.  The organization helps people rehabilitate their lives as

3    they transition out of the gang lifestyle.  Rivas had been involved with

4    a gang earlier in his life and suffered a forgery conviction in 2002, for

5    which he served a 16–month prison term.  He was rehabilitated when

6    he entered a Christian rehabilitation home while on parole.  Rivas

7    earned an Associate of Arts degree in Theology.  Aztec Rising

8    operates in an area where there are approximately 20 gangs.

9         Rivas met Morales when he was enrolled as a client of Aztec

10   Rising.  Morales enrolled himself in 2009 to obtain "the intervention

11   for the rehabilitation for the transition out" of the lifestyle he was in.

12   Aztec Rising hired Morales in 2010 and 2011 as support staff at Lemon

13   Grove Park and Lafayette Park.  Rivas was his boss, and Morales did

14   "a really great job."  Morales organized sporting events.  He had a

15   stressful job because he was responsible for making sure attendees

16   were engaged and not just hanging out and causing problems in the

17   park.  He was a "fairly good employee."

18       Morales brought over 12 gang members, including MS

19   members, to Aztec Rising as clients.  He took risks by referring gang

20   members to Aztec Rising.  The gangs want to recruit members and be

21   strong, and Morales was working against the gang.  He could have

22   been beaten up, shot or killed.

23       Rivas believed Morales was responsible, possessed of a good

24   work ethic and a family man who was good to his wife.  Rivas's

25   opinion of Morales would not change based on the January 3, 2011

26   crimes or the fact he was charged with having a gun.  Rivas believed

27   Morales might be having some challenges in his rehabilitation, but that

28

1  would be the extent of it.  He believed that Morales had begun the
2  process of removing his tattoos.

3  **Prosecution Rebuttal Evidence**

4      By way of rebuttal, the prosecutor and Morales stipulated that,
5  at approximately 11:05 p.m. on November 4, 2011, Officer Velasco saw
6  Morales toss a stainless steel revolver toward an open car door.  The
7  officer later determined that the gun was loaded.  Morales was in the
8  area of 68th and Hoover Streets, which was an area claimed by the
9  18th Street gang.

10  Lodg. 5 at 2-7.

11  **V.**

12  **<u>STANDARD OF REVIEW</u>**

13      Under the Antiterrorism and Effective Death Penalty Act of 1996
14  ("AEDPA"), a federal court may not grant habeas relief on a claim adjudicated on
15  its merits in state court unless the adjudication:

16      (1) resulted in a decision that was contrary to, or involved an
17  unreasonable application of, clearly established Federal law, as
18  determined by the Supreme Court of the United States; or
19      (2) resulted in a decision that was based on an unreasonable
20  determination of the facts in light of the evidence presented in the
21  State court proceeding.

22  28 U.S.C. § 2254(d).

23      "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes
24  only 'the holdings, as opposed to the dicta, of th[e] [United States Supreme]
25  Court's decisions'" in existence at the time of the state court adjudication.  <u>White</u>
26  <u>v. Woodall</u>, ____ U.S. ____, 134 S. Ct. 1697, 1702, 1706, 188 L. Ed. 2d 698 (2014).
27  However, "circuit court precedent may be 'persuasive' in demonstrating what law

28

14

1    is 'clearly established' and whether a state court applied that law unreasonably."

2    Maxwell v. Roe, 628 F.3d 486, 494 (9th Cir. 2010) (citation omitted).

3         Overall, AEDPA presents "a formidable barrier to federal habeas relief for

4    prisoners whose claims have been adjudicated in state court." Burt v. Titlow, ____

5    U.S. ____, 134 S. Ct. 10, 16, 187 L. Ed. 2d 348 (2013).  The federal statute presents

6    "a difficult to meet . . . and highly deferential standard for evaluating state-court

7    rulings, which demands that state-court decisions be given the benefit of the

8    doubt." Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557

9    (2011) (internal citation and quotation marks omitted).  On habeas review, AEDPA

10   places the burden on petitioners to show the state court's decision "was so lacking

11   in justification that there was an error well understood and comprehended in

12   existing law beyond any possibility for fairminded disagreement." Harrington v.

13   Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).  Put another

14   way, a state court determination that a claim lacks merit "precludes federal habeas

15   relief so long as fairminded jurists could disagree" on the correctness of that ruling.

16   Id. at 101.  Federal habeas corpus review therefore serves as "a guard against

17   extreme malfunctions in the state criminal justice systems, not a substitute for

18   ordinary error correction through appeal." Id. at 102-03 (internal citation and

19   quotation marks omitted).

20        Where the last state court disposition of a claim is a summary denial, this

21   Court must review the last *reasoned* state court decision addressing the merits of

22   the claim under AEDPA's deferential standard of review.  Maxwell, 628 F.3d at

23   495. See also Berghuis v. Thompkins, 560 U.S. 370, 380, 130 S. Ct. 2250, 176 L.

24   Ed. 2d 1098 (2010) (when a state supreme court denies discretionary review of a

25   decision on direct appeal, the appellate court's decision is the relevant state-court

26   decision for purposes of AEDPA's standard of review); Ylst v. Nunnemaker, 501

27   U.S. 797, 803-04, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991).

28

Here, the California Court of Appeal's August 20, 2014 opinion on Petitioner's direct appeal (see lodg. 5) stands as the last reasoned decision with respect to Petitioner's <u>Boykin</u> argument in Claim One and the entirety of Claim Two, and will be reviewed under AEDPA's deferential standard of review for claims "adjudicated on the merits."  28 U.S.C. § 2254(d); <u>Richter</u>, 562 U.S. at 99.

Where, as here with respect to Petitioner's <u>Apprendi</u> argument in Claim One and Claims Three and Four, the state courts supply no reasoned decision on the claims presented for review, this Court must perform an "'independent review of the record' to ascertain whether the state court decision was objectively unreasonable."  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003) (citing <u>Delgado v. Lewis</u>, 223 F.3d 976, 981-82 (9th Cir. 2000)).

# VI.

# DISCUSSION

## A.   CLAIM ONE – UNLAWFUL SENTENCING ENHANCEMENT

### 1.   Petitioner's Claim

In Claim One, Petitioner argues the trial court violated his rights under <u>Boykin v. Alabama</u>, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969) and <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) when it imposed a sentencing enhancement for Petitioner's prior juvenile adjudication.  Pet. at 7-10.[4]

///

---

[4] In addition to arguing Petitioner's contentions lack merit, Respondent also argues relief is barred by <u>Teague v. Lane</u>, 489 U.S. 288, 310, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) ("new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced") because Petitioner's contentions are not supported by clearly established United States Supreme Court precedent and the circuit courts have split on the issues. Answer at 9-11.  Respondent's argument is well taken.  Because granting Petitioner's claims would require the application of a new rule, <u>Teague</u> bars relief here.  <u>Turner v. Marshall</u>, 63 F.3d 807, 818-19 (9th Cir. 1995) (where intercircuit split on issue exists, <u>Teague</u> bars relief), <u>overruled on other grounds by Tolbert v. Page</u>, 182 F.3d 677 (9th Cir. 1999).

1        2.      **Boykin**

2              a.      **Petitioner's Claim**

3        Petitioner contends the trial court did not properly advise him of his rights

4   under Boykin, i.e. his privilege against self-incrimination, his right to trial by jury,

5   and his right to confront his accusers, before accepting a stipulation that Petitioner

6   had suffered the prior adjudication.  Pet. at 7-9.

7              b.      **Additional Relevant Facts**

8        Prior to jury selection, the parties discussed the prior conviction allegation:

9              The Court:  . . . There is an allegation, obviously, that Mr.

10  Morales had suffered what is commonly referred to as a prior strike

11  conviction, in a conviction under 667.5.

12              My question, do you want the proof of those priors bifurcated?

13              [Defense Counsel]:  Yes.

14              The Court:  The next question obviously evolves to whether or

15  not your client is inclined to waive jury trial as to those prior charges

16  should he be convicted of any of the offenses.

17              And I ask that you discuss that with him now so that we can just

18  take care of that at this juncture.

19              [Defense Counsel]:  Okay.

20              (The defendant Morales and defense counsel Johnson confer off

21  the record.)

22              [Defense Counsel]:  In the event there's a conviction on the

23  case, your Honor, I have advised Mr. Morales that he would have the

24  right to a jury trial on a part of the issue as to whether or not the

25  conviction was -- prior conviction was sustained, and then the court

26  would decide I believe whether or not he's party.

27              He's willing to waive jury and let the court decide those issues.

28

1    The Court:  I appreciate that, Mr. Morales, that is often how it

2    is done.  But you do have a right for the same jury that makes a

3    determination as to the guilt or innocence as to the charges that are

4    pending to make a decision as to whether or not you have sustained

5    the prior convictions that are alleged.

6         Is it, in fact, acceptable to you that this jury be discharged after

7    they return their verdicts; and should they return a guilty verdict, the

8    People would have to prove to me alone beyond a reasonable doubt

9    that you were convicted of one or more of the priors alleged against

10   you?  Is that acceptable to you?

11        [Petitioner]:  Yes.

12        The Court:  Very well.

13        Counsel join?

14        [Defense Counsel]:  Yes.

15   Lodg. 14 at 9-11.

16        At sentencing, the trial court stated its intention to "restore essentially the

17   previously offered [eighteen-year] sentence by the People."  5 RT at 4218.  The

18   parties then discussed for the record the parties' stipulation to the prior strike

19   allegation:

20        [Defense Counsel]:  Regarding the strike prior, it's a juvenile

21        matter, it's my understanding.  It's a juvenile matter, and it was

22        resolved as an adjudication.  So I will stipulate to it.

23        The Court:  You will stipulate?

24        [Defense Counsel]:  Yes.

25        The Court:  Thank you.

26        . . . Mr. Morales, your counsel is prepared to stipulate to the

27        prior conviction as a juvenile that has been set forth in the

28        information.

18

1          Do you concur with that stipulation?  Do you agree with it?

2          (The defendant Morales and defense counsel Mr. Johnson

3      confer off the record.)

4          [Petitioner]:  Yes.

5          The Court:  Thank you.

6  5 RT at 4219-20.  The trial court then proceeded to impose the intended eighteen-

7  year prison sentence.  5 RT at 4221-22.

8          **c.     State Court Opinion**

9          The state court reviewed the law regarding <u>Boykin</u>/<u>Tahl</u> advisements and

10 found: "'if the transcript does not reveal complete advisements and waivers, the

11 reviewing court must examine the record of "the entire proceeding" to assess

12 whether the defendant's admission of the prior conviction was intelligent and

13 voluntary in light of the totality of circumstances.'"  Lodg. 5 at 10 (quoting <u>People</u>

14 <u>v. Mosby</u>, 33 Cal. 4th 353, 361 (2004)).  The court found Petitioner's case

15 analogous to <u>Mosby</u> and reasoned as follows:

16          *Mosby* reasoned that "unlike a trial on a criminal charge, trial on

17      a prior conviction is 'simple and straightforward,' often involving only

18      a presentation by the prosecution 'of a certified copy of the prior

19      conviction along with the defendant's photograph [or] fingerprints'

20      and no defense evidence at all.  [Citation.]  Here, [Mosby], who was

21      represented by counsel, had *just* undergone a jury trial at which he did

22      not testify, although his codefendant did.  Thus, he not only would

23      have known of, but had just exercised, his right to remain silent at

24      trial, forcing the prosecution to prove he had sold cocaine.  And,

25      because he had, through counsel, confronted witnesses at that

26      immediately concluded trial, he would have understood that at a trial

27      he had the right of confrontation."  (*Mosby, supra,* 33 Cal.4th at p.

28      364.)

1    *Mosby* also reasoned that a defendant's prior experience with

2    the criminal justice system should be considered as part of the totality

3    of the circumstances. (*Mosby, supra,* 33 Cal.4th at p. 365.)  Such

4    experience is relevant to a recidivist's knowledge and sophistication

5    with respect to his or her legal rights. (*Ibid*.)  "Under the totality of

6    circumstances," *Mosby* concluded the "defendant voluntarily and

7    intelligently admitted his prior conviction despite being advised and of

8    having waived only his right to jury trial." (*Ibid*.)

9        In the instant case, Morales was advised of his right to a jury

10   trial.  He decided to waive that right.  After the jury found Morales

11   guilty on all counts, the court asked if he had admitted or stipulated to

12   the prior conviction.  [Petitioner's counsel] recalled that no record had

13   been made of an admission and he and Morales stipulated at that point

14   to the prior conviction after they discussed the issue.  Morales had

15   observed his own jury trial on the current offenses, during which he

16   exercised his right to confront witnesses and his right against self-

17   incrimination[.]

18       In sum, the record affirmatively shows the admission was

19   voluntary and intelligent under the totality of the circumstances even

20   though Morales was not expressly advised of his rights to confront

21   witnesses and against self-incrimination.

22   Lodg. 5 at 11-12.

23           **d.    Legal Standard**

24       It is clearly established federal law that a guilty plea must be voluntarily,

25   knowingly, and intelligently entered.  <u>Brady v. United States</u>, 397 U.S. 742, 748, 90

26   S. Ct. 1463, 25 L. Ed. 2d 747 (1970); <u>Boykin v. Alabama</u>, 395 U.S. 238, 242, 89 S.

27   Ct. 1709, 23 L. Ed. 2d 274 (1969).  The record must reflect that a criminal

28   defendant pleading guilty understands, and is voluntarily waiving, his rights to the

privilege against compulsory self-incrimination, to trial by jury and to confront one's accusers. <u>Boykin</u>, 395 U.S. at 243. However, the United States Supreme Court has not yet decided whether <u>Boykin</u> applies to prior conviction allegation, and the circuits appear split on the issue. <u>Compare</u> <u>Cox v. Hutto</u>, 589 F.2d 394, 396 (8th Cir. 1979) (finding admissions to prior convictions are the functional equivalent of a guilty plea); <u>Virgin Islands v. George</u>, 741 F.2d 643, 648-49 (3d Cir. 1984) (same) <u>with</u> <u>Johnson v. Cowley</u>, 40 F.3d 341, 346 (10th Cir. 1994) (stating "we cannot conclude a stipulation to the fact of a prior valid conviction in an enhancement proceeding is the functional equivalent of a guilty plea"); <u>Joseph v. Butler</u>, 838 F.2d 786, 790-91 (5th Cir. 1988) (same); <u>Dombrowski v. Mingo</u>, 543 F.3d 1270, 1276 (11th Cir. 2008) (same).

　　　　To the extent Ninth Circuit precedent may guide a <u>Boykin</u> analysis under these circumstances, the state of the law in the circuit is unclear. The Ninth Circuit once held under then-existing California law, an admission of a prior conviction in state court which subjects the accused to an enhanced sentence is the functional equivalent of a guilty plea to a separate charge. <u>Wright v. Craven</u>, 461 F.2d 1109, 1109 (9th Cir. 1972). Under this precedent, the admission of a prior conviction is not valid unless the defendant understood the consequences flowing therefrom. <u>Id.</u> at 1110. Subsequently, however, Judge Kozinski in his concurring opinion in <u>Adams v. Peterson</u>, 968 F.2d 835 (9th Cir. 1992) interpreted the holding in <u>Wright</u> to require only that the trial court determine whether the defendant knowingly and voluntarily agreed to stipulate to the fact of a prior conviction. <u>Adams</u>, 968 F.2d at 841 n.4 (Kozinski, J., concurring). The Ninth Circuit has since questioned whether <u>Wright</u> is still good law, <u>see</u>, <u>e.g.</u>, <u>United States v. Reed</u>, 575 F.3d 900, 928 (9th Cir. 2009), and recognized the apparent tension between <u>Wright</u> and <u>Adams</u>. <u>Lowell v. Prunty</u>, 91 F.3d 1358, 1359 (9th Cir. 1996). When presented again with the issue in <u>Lowell</u>, the Ninth Circuit refused to resolve the

1  tension because any <u>Boykin</u> error was harmless, as there was no dispute about the
2  validity of the prior conviction.  <u>Lowell</u>, 91 F.3d at 1359.

3      **e.    Analysis**

4      First, absent "clearly established Federal law" supporting Petitioner's
5  claim, this Court cannot find the state courts' denial to be an "unreasonable
6  application" of United States Supreme Court precedent.  <u>Wright v. Van Patten</u>,
7  552 U.S. 120, 126, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008); <u>Carey v. Musladin</u>, 549
8  U.S. 70, 77, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).

9      Second, the state court, at least in part, applied a standard akin to that
10  applied in <u>Adams</u>, <u>i.e.</u> a defendant must knowingly and voluntarily agree to
11  stipulate to a prior conviction allegation.  <u>See Adams</u>, 968 F.2d at 841 n.4.  Given
12  the uncertainty surrounding the application of <u>Boykin</u> to prior conviction
13  allegations, it was not unreasonable for the state court to apply an analysis similar to
14  <u>Adams</u>.

15      Third, having applied the <u>Adams</u> analysis, the state court reasonably
16  concluded Petitioner's stipulation to the prior conviction was knowing and
17  voluntary.  It is clear from the record Petitioner had an opportunity to discuss the
18  stipulation with counsel.  In addition, the trial court had already explained to
19  Petitioner what the anticipated sentence would be after he stipulated to the prior
20  conviction allegation, thereby assuring Petitioner knew the consequence of his plea.
21  Having this knowledge, Petitioner voluntarily stipulated to the fact of the prior
22  conviction.

23      Finally, even if this Court could find Petitioner should have been advised
24  pursuant to <u>Boykin</u> before stipulating to the fact of the prior conviction, any error
25  was harmless.  Petitioner makes vague allegations that his prior juvenile
26  adjudication was infirm, but has not provided any evidence to show the
27  adjudication would have been found untrue had the trial court held a bench trial on

28

1    the matter.  See Lowell, 91 F.3d at 1359 (finding any potential Boykin error

2    harmless where there was no question about the validity of the prior conviction).

3        **3.    Apprendi**

4            **a.    Petitioner's Claim**

5        Petitioner also argues the trial court erred in counting a prior juvenile

6    adjudication as a "prior conviction" (i.e., a "strike") pursuant to California's

7    "Three Strikes" sentencing enhancement.  Pet. at 9-10.  Petitioner contends the

8    trial court's use of the juvenile adjudication for the enhancement violated his Sixth

9    Amendment rights because he did not have a right to a jury trial at the juvenile

10   adjudication, and thus the adjudication does not satisfy Apprendi's "other than a

11   prior conviction" exception.  Id.

12           **b.    Legal Standard**

13       The United States Supreme Court has held that, "[o]ther *than the fact of a*

14   *prior conviction,* any fact that increases the penalty for a crime beyond the

15   prescribed statutory maximum must be submitted to a jury, and proved beyond a

16   reasonable doubt."  Apprendi, 530 U.S. at 490 (emphasis added).  In the context of

17   a *federal* criminal prosecution, the Ninth Circuit has held that nonjury juvenile

18   adjudications do not fall within the "prior conviction" exception to Apprendi.

19   United States v. Tighe, 266 F.3d 1187, 1195 (9th Cir. 2001).  The Ninth Circuit

20   concluded in Tighe that prior juvenile proceedings lacking certain procedural

21   safeguards (such as trial by jury and the requirement that guilt be established by

22   proof beyond a reasonable doubt) cannot be used to increase a sentence past the

23   statutory maximum under Apprendi.  Id. at 1193-95; Boyd v. Newland, 467 F.3d

24   1139, 1151 (9th Cir. 2006).

25       At the same time, however, for purposes of federal habeas review, the Ninth

26   Circuit has expressly rejected a Sixth Amendment challenge to a sentencing

27   enhancement based on a prior nonjury juvenile adjudication.  Boyd, 467 F.3d at

28   1152.  In Boyd, the Ninth Circuit noted both California state courts and other

                                              23

federal circuit courts of appeals have disagreed with the holding in <u>Tighe</u> and that the United States Supreme Court has not resolved this split in authority.  <u>Id.</u> (citing California appellate precedent and cases from the Third, Eighth, and Eleventh Circuits).  Consequently, the Ninth Circuit concluded <u>Tighe</u> does not represent "clearly established federal law 'as determined by the Supreme Court of the United States'" and thus does not provide a basis for federal habeas relief.  <u>Id.</u> (quoting 28 U.S.C. § 2254(d)(1)); <u>see also</u> <u>John-Charles v. California</u>, 646 F.3d 1243, 1252 (9th Cir. 2011) ("We have already determined that our holding in <u>Tighe</u> is not clearly established Federal law for AEDPA purposes.").

### c.    Analysis

First, absent "clearly established Federal law" supporting Petitioner's claim, this Court cannot find the state courts' denial to be an "unreasonable application" of United States Supreme Court precedent.  <u>Wright</u>, 552 U.S. at 126; <u>Carey</u>, 549 U.S. at 77.

Second, pursuant to <u>Boyd</u>, the Court finds the state court's rejection of Petitioner's sentencing error claim was not "contrary to" or an "unreasonable application" of clearly established federal law.  <u>See</u> 28 U.S.C. § 2254(d)(1).

Accordingly, habeas relief is not warranted on Petitioner's sentencing error claim.

## B.    CLAIM TWO – SUFFICIENCY OF THE EVIDENCE

### 1.    Petitioner's Claim

In Claim Two, Petitioner contends his two vandalism convictions and his conviction for robbery of Roberto violated Petitioner's due process rights because they were not supported by sufficient evidence.  Pet. at 11-14.

### 2.    Applicable Law

The Fourteenth Amendment's Due Process Clause guarantees a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  <u>In re Winship</u>,

397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).  The United States Supreme Court announced the federal standard for determining the sufficiency of the evidence to support a conviction in <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  Under <u>Jackson</u>, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  The Supreme Court has held "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson</u>, 443 U.S. at 319.  "Put another way, the dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"  <u>Chein v. Shumsky</u>, 373 F.3d 978, 982-83 (9th Cir. 2004) (*en banc*) (quoting <u>Jackson</u>, 443 U.S. at 318).

When the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution, and the court must defer to that resolution.  <u>Jackson</u>, 443 U.S. at 326.  "<u>Jackson</u> cautions reviewing courts to consider the evidence 'in the light most favorable to the prosecution.'"  <u>Bruce v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004) (quoting <u>Jackson</u>, 443 U.S. at 319).  Additionally, "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction."  <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

The <u>Jackson</u> standard applies to federal habeas claims attacking the sufficiency of the evidence to support a state conviction.  <u>Juan H.</u>, 408 F.3d at 1274; <u>Chein</u>, 373 F.3d at 983; <u>see also</u> <u>Bruce</u>, 376 F.3d at 957.  The federal court must refer to the substantive elements of the criminal offense as defined by state law and look to state law to determine what evidence is necessary to convict on the

1   crime charged.  <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Juan H.</u>, 408 F.3d at 1275.  AEDPA,

2   however, requires the federal court to "apply the standards of <u>Jackson</u> with an

3   additional layer of deference."  <u>Juan H.</u>, 408 F.3d at 1274.  The federal court must

4   ask "whether the decision of the California Court of Appeal reflected an

5   'unreasonable application' of <u>Jackson</u> and <u>Winship</u> to the facts of this case."  <u>Id.</u> at

6   1275 & n.13.

7         **3.    Vandalism**

8              **a.    Petitioner's Claim**

9         First, Petitioner claims the evidence was insufficient to prove he was the

10  individual Officer Phan saw acting as a lookout during the vandalism crimes.  Pet.

11  at 11.

12             **b.    State Court Opinion**

13        The state court found there was sufficient evidence to support Petitioner's

14  convictions for vandalism as an aider and abettor.  Lodg. 5 at 13.  The court

15  discussed the evidence against Petitioner in the light most favorable to the

16  prosecution and reasoned as follows:

17             Given the degree of circumstantial evidence, a reasonable jury

18             could have drawn the inference that Morales and Alvarado met up

19             with a third gang member after robbing the four youths and proceeded

20             to aid the tagger in placing graffiti on the restaurant and church in

21             their neighborhood.  Whatever other conclusions the jury might have

22             drawn from the evidence, "it is the jury, not the appellate court which

23             must be convinced of the defendant's guilt beyond a reasonable

24             doubt."  (*People v. Bean* (1988) 46 Cal.3d 919, 933.)

25  <u>Id.</u>

26             **c.    Analysis**

27        Petitioner does not argue that the evidence failed to prove the lookout was

28  guilty of vandalism under California law pursuant to an aiding and abetting theory.

1   Rather, he argues the evidence was insufficient to prove Petitioner's identity as the
2   lookout Officer Phan saw.  Petitioner's argument is not persuasive.

3         Officer Phan saw the lookout for about 10 seconds, made eye contact with
4   him, and saw his face.  3 RT at 1288, 1511-12, 1538.  When Petitioner later
5   approached officers, Officer Phan recognized Petitioner's face, height, and weight
6   as matching that of the lookout.  3 RT at 1286-87, 1289, 1516, 1542-43.  Officer
7   Phan's identification was direct evidence Petitioner was the lookout.

8         In addition, the tagger and the lookout appeared to be connected to a car that
9   Officer Phan saw nearby, a car Petitioner claimed ownership of and which was
10  driven by his accomplice in the iPod robberies.  2 RT at 944; 3 RT at 1286, 1289,
11  1294-95, 1510-11, 1516, 1540, 1543, 1548, 1553.  The car was parked near the tagger
12  and the lookout, the passenger door was open, and when the tagger saw police
13  approaching, he first ran toward the car before running off in a different direction.
14  3 RT at 1542-43.  Officers found one spray paint can in the gutter near the car and
15  another on the car's floorboard.  3 RT at 1290, 1511.  Also, the tagging identified
16  Petitioner's gang and was placed within that gang's territory.  3 RT at 1290-94,
17  1582-83, 1586-88.  This circumstantial evidence linked the vandalism to
18  Petitioner's gang, showed the lookout was associated with Petitioner's car, and
19  connected the driver of the car, who was detained at the scene of the vandalism, to
20  the robberies that Petitioner committed just before the vandalism.

21        This evidence was sufficient for a rational trier of fact to conclude Petitioner
22  was the lookout and, thus, was guilty of vandalism as an aider and abettor.

23        **4.    Robbery of Roberto**
24              **a.    Petitioner's Claim**
25        Next, Petitioner claims the evidence was insufficient to support his
26  conviction for robbery of Roberto.  Pet. at 11-12, 14.  Petitioner suggests one of the
27  other victims was in possession of Roberto's iPod at the time of the robbery and,
28  therefore, Petitioner could not have robbed Roberto.  Id.

1

### b.    State Court Opinion

2    The state court found there was sufficient evidence to support Petitioner's

3    conviction for robbery of Roberto.  Lodg. 5 at 15.  The court reasoned as follows:

4          Benjamin testified that he was with Josue, Christopher, and

5    Roberto when Morales and Alvarado cut them off with their car.

6    Morales got out of the driver's seat and approached them, and

7    Benjamin saw his friends "taking out their stuff."

8          Although Benjamin did not see Roberto give up his iPod, at

9    trial, Benjamin identified all four of the iPods found by police and

10    depicted in People's exhibit 4.  He identified Roberto's iPod

11    specifically as one of them.  Josue, who testified at trial that he did not

12    recall anything, and whose credibility was soundly impeached with his

13    preliminary hearing testimony, stated at that hearing that he saw the

14    robbers take "Robert F.'s" iPod and his own.  He identified the

15    robbers as Morales and Alvarado.  Josue was also impeached by

16    Officer Phan's testimony.  Officer Phan found what was identified as

17    Roberto's iPod in the center console of Morales's car.

18          Even apart from Josue's testimony at the preliminary hearing,

19    the fact that Roberto's iPod was found among the stolen iPods after

20    the four young men had been robbed is substantial evidence that

21    Roberto was a victim of robbery.  . . .

22          Under the circumstances of this case, even if Roberto's iPod

23    was in the possession of one of his three friends, Roberto had the right

24    to control it at the same time.  (*People v. DeFrance, supra,* 167

25    Cal.App.4th at p. 497.)  Were it not for his fear, Roberto could have

26    acted to retain his property.  (*People v. Hayes* (1990) 52 Cal.3d 577,

27    626–627.)  Roberto owned the iPod, and the evidence showed beyond

28    a reasonable doubt that Roberto's iPod was taken by Alvarado and

1   Morales from his immediate presence and his actual or constructive

2   possession.

3   Id.

### c.   Applicable California Law

5   Under California law, "[r]obbery is the felonious taking of personal property

6   in the possession of another, from his person or immediate presence, and against

7   his will, accomplished by means of force or fear."  Cal. Penal Code § 211.  In

8   People v. Abilez, 41 Cal. 4th 472 (2007), the California Supreme Court discussed

9   the immediate presence element of California's robbery statute:

> "The generally accepted definition of immediate presence . . . is
> that '"[a] thing is in the [immediate] presence of a person, in respect
> to robbery, which is so within his reach, inspection, observation or
> control, that he could, if not overcome by violence or prevented by
> fear, retain his possession of it."'" (*People v. Hayes* (1990) 52 Cal.3d
> 577, 626-627, 276 Cal.Rptr. 874, 802 P.2d 376.)  . . . .  "The zone of
> immediate presence [for purposes of robbery] includes the area
> 'within which the victim could reasonably be expected to exercise
> some physical control over his property.'" (*People v. Webster* (1991) 54
> Cal.3d 411, 440, 285 Cal.Rptr. 31, 814 P.2d 1273; see *People v. Holt*
> (1997) 15 Cal.4th 619, 675, 63 Cal.Rptr.2d 782, 937 P.2d 213 [although
> victim was killed in the bedroom, items in her kitchen were in her
> "immediate presence" for robbery purposes].)

23   Abilez, 41 Cal. 4th at 507.

### d.   Analysis

25   The evidence supports Petitioner's conviction for robbery of Roberto under

26   either of two theories: (1) Roberto was in possession of his iPod and personally

27   relinquished it to Petitioner, or (2) one of the other victims was in possession of

1   Roberto's iPod when Petitioner took it but Roberto was still in the immediate

2   presence of his property.

3        On the night of the crimes, Benjamin told Officer Phan Petitioner had taken

4   iPods from him and his friends. 3 RT at 1310-11. At trial, Benjamin testified

5   Petitioner approached all four victims and said, "Let me get your guys' stuff." 2

6   RT at 961-62. Benjamin further testified he gave Petitioner his iPod and he saw

7   Christopher and Josue each give up one iPod. 2 RT at 943, 970, 973, 982, 986,

8   1017. Four iPods were found in the possession of Petitioner and his accomplices, 3

9   RT at 1308-09, 1554, including Roberto's, 3 RT at 1308. The clear implication is

10  Roberto personally handed his iPod to Petitioner during the robbery. In addition,

11  although Josue claimed to have a failed memory at the time of trial, he was

12  impeached with his testimony from the preliminary hearing that he saw Petitioner

13  take Roberto's iPod. 3 RT at 1251.

14       Moreover, even if the evidence did not support a finding Petitioner took the

15  iPod directly from Roberto, there is no dispute Petitioner took Roberto's iPod from

16  one of the four boys present during the robbery. This would place Roberto in close

17  enough proximity to his iPod so, "if not overcome by violence or prevented by fear,

18  [Roberto could have] retain[ed] his possession of" hid iPod. Abilez, 41 Cal. 4th at

19  507.

20       Hence, after viewing the evidence presented at trial in the light most

21  favorable to the prosecution and presuming that the jury resolved all conflicting

22  inferences from the evidence against Petitioner, the Court finds that a rational juror

23  "could reasonably have found beyond a reasonable doubt" that Petitioner was

24  guilty of vandalism and robbery of Roberto. Jackson, 443 U.S. at 325-26. Under

25  these circumstances, the state court's finding of sufficient evidence to support the

26  jury's findings was not "contrary to" or an "unreasonable application" of "clearly

27  established federal law." See 28 U.S.C. § 2254(d)(1). Thus, habeas relief is not

28  warranted on Claim Two.

## C.   CLAIM THREE – RIGHT TO COUNSEL OF CHOICE

### 1.   Petitioner's Claim

Next, Petitioner argues in Claim Three the trial court violated his Sixth Amendment right to counsel of choice by denying Petitioner's request to replace his appointed counsel with privately retained counsel.  Pet. at 15-17.

On the morning Petitioner's case was set to be sent out for trial, retained counsel Alex Kessel appeared before the court seeking to substitute in as Petitioner's trial attorney.  Lodg. 16 at 1-2.  The court conducted a hearing pursuant to People v. Marsden, 2 Cal. 3d 118 (1970), after which Petitioner's motion to substitute counsel was denied.  Lodg. 16 at 3; Lodg. 17 at B4-B9.

The next day, Petitioner brought a Marsden motion before the court assigned to Petitioner's trial.  Lodg. 18 at 48-57.  Petitioner urged the court to allow him to proceed to trial with his retained counsel.  Id. at 56.  The court denied Petitioner's motion and advised him as follows:

> On the eve of trial is not the time when one makes a request to
> hire private counsel.  This case is very old.  And I'm not going to
> revisit that issue that was addressed in Department 100.

> Mr. Morales, Mr. Johnson will remain your attorney during the
> pendency of this trial.

Id. at 57.

### 2.   State Court Opinion

The California Supreme Court summarily denied Petitioner's habeas petition claiming a denial of his right to counsel of his choice.  Lodg. 9.

### 3.   Applicable Law

Under longstanding Supreme Court authority, the Sixth Amendment right to counsel encompasses a criminal defendant's right to retain counsel of his choice. Powell v. Alabama, 287 U.S. 45, 53, 53 S. Ct. 55, 77 L. Ed. 158 (1932) (holding that a criminal defendant must be afforded a "fair opportunity to secure counsel of his

1   own choice"); see also Chandler v. Fretag, 348 U.S. 3, 10, 75 S. Ct. 1, 99 L. Ed. 4

2   (1954) ("[A] defendant must be given a reasonable opportunity to employ and

3   consult with counsel.").

4        However, "while the right to select and be represented by one's preferred

5   attorney is comprehended by the Sixth Amendment, the essential aim of the

6   amendment is to guarantee an effective advocate for each criminal defendant rather

7   than to ensure that a defendant will inexorably be represented by the lawyer whom

8   he prefers." Wheat v. United States, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed.

9   2d 140 (1988) (citations omitted).  Accordingly, the right to retained counsel of

10  choice is not absolute.  Id. (noting that "[t]he Sixth Amendment right to choose

11  one's own counsel is circumscribed in several important respects"); accord

12  Walters, 309 F.3d at 592 (stating that the right to hire counsel of choice granted by

13  the Sixth Amendment "is qualified in that it may be abridged to serve some

14  'compelling purpose'") (citing United States v. D'Amore, 56 F.3d 1202, 1204 (9th

15  Cir. 1995), overruled on other grounds by United States v. Garrett, 179 F.3d 1143,

16  1145 (9th Cir. 1999)).  A trial court enjoys "wide latitude in balancing the right to

17  counsel of choice against the needs of fairness, and against the demands of its

18  calendar."  United States v. Gonzalez-Lopez, 548 U.S. 140, 152, 126 S. Ct. 2557,

19  165 L. Ed. 2d 409 (2006) (citations omitted).  Trial courts also have the discretion

20  to "make scheduling and other decisions that effectively exclude a defendant's first

21  choice of counsel."  Miller v. Blacketter, 525 F.3d 890, 895 (9th Cir. 2008).

22       On habeas review, a trial court's denial of choice of counsel is reviewed for

23  abuse of discretion by balancing the defendant's right of chosen counsel with

24  concerns of fairness and scheduling.  Id. at 896.  The Ninth Circuit has identified

25  three factors that comprise this analysis:  (1) whether the defendant had retained

26  new counsel, (2) whether current counsel was prepared and competent to proceed

27  forward, and (3) the timing of defendant's request.  Id. at 896-98; but see Daniels v.

28

32

1 <u>Woodford</u>, 428 F.3d 1181, 1200 (9th Cir. 2005) (the fact that a motion to substitute

2 is made on the eve of trial alone is not dispositive).

3 **4.    Analysis**

4 First, in analyzing whether the petitioner had already retained new counsel,

5 the court in <u>Miller</u> also considered that "it was unclear how much time a new

6 attorney, once hired, would have needed to prepare for [the petitioner's] trial,"

7 despite the fact that the petitioner's father had already taken steps to find a

8 substitute attorney. <u>Miller</u>, 525 F.3d at 896; <u>compare with</u> <u>Bradley v. Henry</u>, 510

9 F.3d 1093, 1100 (9th Cir. 2007), <u>amended on denial of reh'g</u>, 518 F.3d 657 (9th Cir.

10 2008) (habeas relief should have been granted where the trial court denied the

11 petitioner's motion to substitute retained counsel, despite the fact that the motion

12 was filed forty-six days before trial and substitute counsel indicated on the record

13 that there would be no delay to the start of trial).  Here, although Petitioner claims

14 retained counsel Kessel was prepared to proceed with trial without delay, he does

15 not provide any evidence, other than his own self-serving declaration, to support

16 his assertion. Pet. at 15.  Although the trial court spoke with Kessel off the record,

17 there is no indication Kessel represented to the court he was prepared to represent

18 Petitioner without delay. Lodg. 16 at 1-2.  Similarly, there is no evidence the trial

19 court was made aware of Petitioner's belief that Kessel was prepared to go to trial

20 that day, despite the opportunity to do so at both <u>Marsden</u> hearings.  Lodg. 17 at

21 B4-B9 (on May 22, 2013, the court repeatedly asked Petitioner to explain his

22 "issues"); Lodg. 18 at 48-57.  Moreover, the court's statement that "this case is

23 very old," demonstrates the court's understanding, based on the record before it,

24 that substitution would require a continuance for a new attorney to competently

25 become familiar with the record. Lodg. 18 at 57.  Thus, the Court finds that

26 although Petitioner had already retained Kessel when the request for substitution

27 was made, this factor weighs against Petitioner because it is unclear how much time

28 Kessel would have needed to prepare for Petitioner's trial.

Second, current counsel was competent and ready to proceed to trial.  Lodg. 17 at B8 ("Court: Your attorney has a very good reputation in this court."); Lodg. 18 at 50 ("Court: [Your attorney] has a reputation in this courthouse and in this community as an excellent attorney.  Much of it based on his experience."); Lodg. 18 at 51-53 (Petitioner's counsel explains to court he is prepared for trial).  Thus, the Court finds the second factor – whether current counsel was competent and prepared to proceed to trial – does not weigh in Petitioner's favor.

Third, Petitioner's request, made on the day his case was sent out for trial, was untimely.  See, e.g., Miller, 525 F.3d at 897-98 (trial court was justified in denying a motion for continuance to substitute retained counsel where petitioner sought to replace current counsel on the morning of trial); United States v. Williams, 594 F.2d 1258, 1260-61 (9th Cir. 1979) ("[W]here the request for change of counsel comes during the trial, or on the eve of trial, the Court may, in the exercise of sound discretion, refuse to delay the trial to obtain new counsel and therefore may reject the request."); Wheat, 486 U.S. at 163 (where the defendant had moved to substitute his attorney just two days before trial, the trial court did not exceed its "broad latitude" when it relied on "instinct and judgment" to deny the motion on the defendant's asserted ground of conflict of interest).

Lastly, Petitioner argues that the trial court's failure to inquire on the record regarding whether retained counsel was prepared to begin trial immediately entitles Petitioner to relief.[5]  Pet. at 16.  The Court is not persuaded by this argument, as Petitioner had an opportunity to explain to the court his reasons for seeking to substitute his appointed counsel, but never mentioned Kessel was prepared to

---

[5] Petitioner cites Rhodes v. Dittmann, 783 F.3d 669, 676 (7th Cir. 2015), reh'g denied (June 19, 2015) in support of his argument that the trial court had an obligation to inquire whether the substitution would cause a delay.  See Pet. at 16-17.  However, in Rhodes, the Seventh Circuit reversed a district court's grant of habeas relief, finding the state court's determination that petitioner waited too long to renew his request for counsel was a reasonable and sufficient ground for its decision.

begin trial immediately.  See Lodg. 17 at B4-B9; Lodg. 18 at 48-57.  Thus, a reasonable jurist could have concluded the trial court was correct in determining (1) Petitioner's request—made on the day his case was sent out for trial, despite the age of the case—was intended to delay the proceedings; and (2) even if Petitioner did not have a dilatory intent, he simply waited too long to make his request.  See Imbach v. Clark, No. ED CV 09-1957-GW (PLA), 2012 WL 3206670, at *18 (C.D. Cal. Jan. 10, 2012), report and recommendation adopted, 2012 WL 3206643 (C.D. Cal. Aug. 3, 2012).  This conclusion is consistent with clearly established federal law.  See Morris, 461 U.S. at 8–9, 13 (holding the trial court was "abundantly justified" in denying the petitioner's motions to continue trial—made on the first, second, and third days of trial—because the trial court "could have reasonably concluded that [the petitioner's] belated requests . . . were not made in good faith but were a transparent ploy for delay").  Given the trial court's broad discretion, including "the discretion to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel" (Miller, 525 F.3d at 895 (internal citation and quotations omitted)), the Court finds there is no basis for concluding the trial court's denial of Petitioner's request to be represented by Kessel constituted "the type of unreasoning and arbitrary insistence on expeditiousness that clearly established federal law prohibits."  See id. at 898 (citing Morris, 461 U.S. at 11–12); see also Imbach, 2012 WL 3206670, at *18.

Hence, the state court's denial of Petitioner's claim was not "contrary to" or an "unreasonable application" of "clearly established federal law."  28 U.S.C. § 2254(d).  Accordingly, habeas relief is not warranted on Claim Three.

## D.   CLAIM FOUR – JUROR MISCONDUCT

### 1.   Petitioner's Claim

Finally, in Claim Four, Petitioner argues Juror Six should have been excused by the trial court after the court questioned her regarding eye contact between the juror and Petitioner.  Pet. at 18-20.  Petitioner's concern appears to be that the

1  juror was singled out by the trial court and the questioning might have left the juror

2  inclined to vote against Petitioner for fear of appearing biased in his favor.  Id. at 19.

3       During trial, the court informed the parties it and other court staff members

4  had noticed nonverbal communication between Petitioner and Juror Six.  2 RT at

5  1001.  The court explained its staff alerted the court to the fact that "a kiss was

6  blown from one of those individuals to the other."  Id.  The court explained it then

7  watched Juror Six closely and noticed "eye contact of an extraordinary nature

8  transpiring."  Id.  The court's bailiff admitted having seen "eye contact, smiling at

9  each other from both of them."  Id.  The court's clerk stated she had seen "[l]ots

10 of eye contact" and a "[s]mile from Juror No. 6 to the defendant, especially right at

11 the noon break . . . [a] broad smile and he smiled back at her."  2 RT at 1001-02.

12      Later that day, outside the presence of the jury, the court and Petitioner's

13 counsel questioned Juror Six as follows:

14           The Court: . . . Juror No. 6, I need to ask you some questions.

15           My court staff, myself included, have paid particular attention

16      to what we perceive as visual looking at Mr. Morales, exchanging

17      certain expressions.

18           And I just need to know from you what, if anything, from a

19      visual standpoint is taking place between yourself and Mr. Morales.

20           Juror No. 6: There is nothing.  I look around at everyone.  Not

21      only him.  I look at everyone around the court.  So I have no contact

22      with anyone.  I look around, I smile.  I mean, there's nothing.

23           The Court: There's nothing?

24           Juror No. 6: No.

25           The Court: Okay.  Okay.

26           Please bring it to my attention if you believe that anyone during

27      the course of this trial, could be sitting in and out the audience, could

28

36

1    be at counsel table, is looking in a way that you think is not appropriate

2    for a trial.

3            Will you do that for me?

4            Juror No. 6:  Yes.

5            The Court:  Okay.  Please.

6            . . .

7            [Defense Counsel]:  Ma'am you were just asked if there was any

8    contact between you and my client, Mr. Morales.

9            Now, when you go back and when this evidence is over, do you

10   think, if you think about it very quickly here, do you think that this

11   questioning of you might influence your view back there, cause you to

12   think that maybe I better vote a certain way because if I don't they'll

13   think I'm, you know, on his side?

14           Do you think what has just happened in this courtroom now will

15   influence you during deliberations?

16           Juror No. 6:  No, it wouldn't.

17           [Defense Counsel]:  All right.  Juror No. 6, thank you very

18   much.

19   2 RT at 1010-12.  The juror then exited the courtroom before the parties continued

20   their discussion about the incident.  2 RT at 1012.

21           The trial court informed the parties it "will continue to observe and pay

22   particular attention to Juror No. 6 during the pendency of this trial" and if it felt

23   "in any way her representations have been less than candid, the court will go on the

24   record and address this issue again."  Id.  The court also explained to defense

25   counsel if the defense wanted the juror excused the court would entertain the

26   request.  2 RT at 1013.  However, defense counsel stated he did not want the juror

27   excused.  Id.

28

                                         37

On the next court day, the prosecutor again addressed the behavior of Petitioner and Juror Six.  3 RT at 1202-04.  In light of the prosecutor's continued concern, the trial court decided to hear testimony, out of the presence of the jury, from a second deputy who observed the behavior between Petitioner and the juror.  3 RT at 1204.  Deputy Colin testified to his observations as follows:

> The Witness:  Mr. Morales very fidgety.  Turning around.  I believe he has family.  So he's constantly turning around, looking toward the jury.
>
> When he was looking toward the jurors, I would notice him kind of just -- I don't know how to describe it, but like make eye contact, you know, with his eyebrows, kind of like, like if he's saying, hey, what's up.
>
> [Defense Counsel]:  Object to that as speculation.
>
> The Court:  Thank you, asking -- simply asking for this individual's --
>
> The Witness:  I don't know how to describe other than him communicating with his eyebrows.  Like I say, he was very fidgety.  Never saw any movement with his mouth, but I saw like -- no talking, but I saw movement with almost like if almost blowing a kiss type of thing.
>
> The Court:  And what causes you to make that last characterization?
>
> The Witness:  I saw his lips kind of almost like pucker to the point where, like that with the head, with the head nod.
>
> The Court:  And for the record, the witness in demonstrating what he observed caused his lips to move forward in a puckering gesture.

1        The Witness:  The reason why it was noticeable was because,

2    obviously I was sitting right behind him and I could see the side of his

3    face the whole time.

4        The Court:  You could see his profile?

5        The Witness:  Yes, sir.

6  3 RT at 1226-27.  Deputy Colin later identified Juror Six as the juror Petitioner

7  appeared to be communicating with.  3 RT at 1228.

8        On the following court day, the prosecutor asked the trial court if it had given

9  additional thought to the issue involving Juror Six.  3 RT at 1504.  The court gave

10  the following statement:

11        The court has thought further in that regard and at this juncture

12    the court is not prepared to substitute in an alternate juror for that

13    juror.

14        So the record is completely candid, I was somewhat baffled

15    when she survived the exercise of peremptory challenges.  To use a

16    completely nonlegal term, she struck me from the very beginning as a

17    little bit goofy.

18        I have noted her smiling at other people during the course of

19    this trial.  She strikes me as, perhaps, that is a nervous response to

20    being in an unusual setting that she is not used to.

21        And so, based on her representations to the court and the

22    observations the court has made, I am not prepared to substitute her

23    out at this point.

24        I will continue to monitor her posture quite closely.

25  Id.

26        **2.    State Court Opinion**

27        The California Supreme Court summarily denied Petitioner's habeas

28  petition claiming juror misconduct.  Lodg. 9.

1        **3.      Applicable Law**

2        A criminal defendant is entitled to a "fair trial by a panel of impartial,

3   'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d

4   751 (1961).  "Due Process means a jury capable and willing to decide the case solely

5   on the evidence before it, and a trial judge ever watchful to prevent prejudicial

6   occurrences and to determine the effect of such occurrences when they happen."

7   Smith v. Phillips, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).

8   However, "[e]very incident of juror misconduct does not require a new trial,"

9   United States v. Springfield, 829 F.2d 860, 864 (9th Cir. 1987), and habeas relief is

10  only warranted where the alleged juror misconduct "had a substantial and injurious

11  effect or influence in the jury's verdict."  See Mancuso v. Olivarez, 292 F.3d 939,

12  949-50 (9th Cir. 2002) (as amended) (citing Brecht v. Abrahamson, 507 U.S. 619,

13  637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).

14       Moreover, "[t]he Sixth Amendment affords no relief when the defendant's

15  own misconduct caused the alleged juror partiality and the trial judge employed

16  reasonable means under the circumstances to preserve the trial's fairness."

17  Williams v. Woodford, 384 F.3d 567, 626 (9th Cir. 2004); see also United States v.

18  Hernandez, 952 F.2d 1110, 1116–18 (9th Cir. 1991) (no relief when a juror observed

19  the defendant making "a slit across his throat, a motion to the witness who was on

20  the stand" and the court questioned the juror and admonished the entire jury to

21  ignore any gestures or body language).  "Granting habeas corpus relief on the basis

22  of the defendant's own misconduct would subvert the judicial process and allow

23  the defendant to benefit from his own wrongdoing.  If such behavior on the part of

24  the defendant were held to require relief, it would provide an easy device for

25  defendants to provoke constitutional error whenever they might choose to do so."

26  Williams, 384 F.3d at 627 (quoting United States v. Stewart, 256 F.3d 231, 242 (4th

27  Cir. 2001)) (internal quotation marks and brackets omitted).

28

1   In addition, trial courts have broad discretion in assessing juror impartiality.

2   See Irvin, 366 U.S. at 723–25 (citations omitted); Tinsley v. Borg, 895 F.2d 520,

3   525 (9th Cir. 1990) (citations omitted), cert. denied, 498 U.S. 1091, 111 S. Ct. 974,

4   112 L. Ed. 2d 1059 (1991).  A state court's finding that a juror is impartial is entitled

5   to significant deference.  Patton v. Yount, 467 U.S. 1025, 1037 n.12, 104 S. Ct.

6   2885, 81 L. Ed. 2d 847 (1984) (habeas courts owe special deference to state court's

7   determination that juror is impartial) (citations omitted); see also Tinsley, 895 F.2d

8   at 525 ("The findings of state trial and appellate courts on juror impartiality

9   deserve a 'high measure of deference.'" (quoting Rushen v. Spain, 464 U.S. 114,

10  120, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983)).

11      **4.    Analysis**

12      Here, the incident underlying Petitioner's claim was triggered by his own

13  misconduct.  Petitioner engaged in nonverbal communication with Juror Six, even

14  puckering his lips as if to blow the juror a kiss.  Because Petitioner's own behavior

15  set in motion the events he now complains caused Juror Six to be biased, he is not

16  entitled to relief.  See Williams, 384 F.3d at 626.

17      Moreover, the state court reasonably found there was no actual bias.  After

18  holding hearings and questioning Juror Six and Deputy Colin, the court concluded

19  it was not necessary to substitute Juror Six.  3 RT at 1504; see States v. Klee, 494

20  F.2d 394, 396 (9th Cir. 1974) ("The important thing is . . . that each juror keep an

21  open mind until the case has been submitted to the jury."), cert. denied, 419 U.S.

22  835, 95 S. Ct. 62, 42 L. Ed. 2d 61 (1974).  When Petitioner's counsel asked Juror

23  Six whether the questioning by the court would affect her during deliberations, she

24  responded with an unqualified "No, it would not."  2 RT at 1010-12.  The state

25  court's determination of juror impartiality is entitled to "special deference."

26  Yount, 467 U.S. at 1038; Tinsley, 895 F.2d 520, 526 (9th Cir. 1990) (finding

27  petitioner failed to satisfy his burden to show by convincing evidence the California

28  courts' factual determination that the juror had no actual bias was erroneous).

1  Additionally, there is no evidence Juror Six relied upon any evidence outside of the

2  record in reaching a verdict, nor does it appear she decided upon Petitioner's guilt

3  before the case was submitted to the jury.  <u>See</u>, <u>e.g.</u>, <u>Klee</u>, 494 F.2d at 396.

4  Thus, the state court's denial of Petitioner's claim was not "contrary to" or

5  an "unreasonable application" of "clearly established federal law."  28 U.S.C. §

6  2254(d).  Accordingly, habeas relief is not warranted on Claim Four.

7  **E.     PETITIONER IS NOT ENTITLED TO AN EVIDENTIARY**

8  **HEARING**

9  Petitioner requests an evidentiary hearing.  Pet. at 20.  An evidentiary

10  hearing is not warranted where, as here, "the record refutes the applicant's factual

11  allegations or otherwise precludes habeas relief."  <u>Schrirro v. Landrigan</u>, 550 U.S.

12  465, 474, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007).  As such, Petitioner's request

13  for an evidentiary hearing should be denied.

14  **VII.**

15  **<u>CONCLUSION</u>**

16  IT IS THEREFORE RECOMMENDED that the District Court issue an

17  order: (1) accepting the findings and recommendations in this Final Report; (2)

18  directing that judgment be entered denying the Petition; and (3) dismissing the

19  action with prejudice.

20

21

22  Dated: June 7, 2016

23  HONORABLE KENLY KIYA KATO
   United States Magistrate Judge

24

25

26

27

28

42